UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT


UNITED STATES OF AMERICA  :

        vs.            :             CRIMINAL NO. 3:15CR15 (JAM)

THOMAS RECCK        :             October 17, 2016


 THOMAS RECCK'S MEMORANDUM IN AID OF SENTENCING

Shortly after the Foxwoods Resort and Casino opened in 1993, Thomas Recck and his

then-wife Lori made the hour-long drive to Ledyard, curious to see what all the fuss was about.

They walked around the casino, taking note of the large, smoke-filled gaming areas and the

cacophonous, neon-filled rooms that housed the slot machines.  Neither of them gambled during

their visit.  They were content simply to wander around, taking it all in.  After a few hours, they

grew tired, and drove back home.  At the time, Mr. Recck did not think much of the trip.  He

found the casino reasonably entertaining, somewhere he could occasionally go to break up the

monotony of his otherwise quiet, uneventful life.

Nineteen years after his first visit to Foxwoods, Mr. Recck walked into the office of the

Secretary of Connecticut Canine Search and Rescue [hereinafter "CCSAR"] and confessed to

using his access to the organization's bank accounts to steal over $100,000.[1]  For four years

preceding this confession, Mr. Recck had been periodically removing funds in order to feed an

out-of-control gambling addiction.  Between his first visit to Foxwoods in 1993 and his

---

[1] Two days later, he confessed the same to the President of the organization.

confession in 2012, Mr. Recck estimates that he made no less than 1,000 trips to Mohegan Sun and Foxwoods and that he lost upwards of $250,000.

The impact of the Foxwoods and Mohegan Sun casinos on Connecticut and its residents has been well documented. *See* Spectrum Gaming Group, *Gambling in Connecticut: Analyzing the Economic and Social Impacts* (2009), http://www.ct.gov/dosr/lib/dosr/june_24_2009_ spectrum_final_ final_report_to_the_state_of_connecticut.pdf [hereinafter "*Spectrum Report*"]. While the casinos have considerably boosted the economy[2] and lowered the unemployment rate,[3] they have also exacted a significant toll on many nearby residents and communities. This toll has manifested in myriad ways. However, none of these manifestations has been more notable than the resulting increase in economic crime. In 1992, the year Foxwoods opened, state and federal law enforcement officials made fifty-one embezzlement arrests. *Crime in Connecticut: 1992 Annual Report*, Dep't of Pub. Safety Division of State Police 30-31 (1992), http://www. dpsdata.ct.gov/dps/ucr/data/1992/Crime%20in%20Connecticut%201992.pdf. By 2007, the number had increased to 244, a nearly 500 percent increase in Connecticut over that fifteen-year period. *Crime in Connecticut 2007: Connecticut Summary Statistics*, Dep't of Pub. Safety Division of State Police 27 (2007), http://www.dpsdata.ct.gov/dps/ucr/data/2007/ Connecticut%20Summary%20Statistics%202007.pdf. During the same period nationwide, the increase was thirty-eight percent. *Spectrum Report* at 14. Moreover, there is evidence that many of those who stole from their employers used either part or all of those funds to gamble at Foxwoods or Mohegan Sun. *Id.* at 143. From 1998 to 2008, there were at least thirty-one

---

[2] *See Spectrum Report* at 8 (noting that "[t]he two casinos are responsible, directly or indirectly, for $1.2 billion worth of personal income in Connecticut").
[3] *Id.* ("Since 1992, casinos have accounted for about 12 percent of the net new job growth in Connecticut.").

newspaper articles involving separate incidents that reported that funds embezzled from Connecticut businesses and organizations were used to gamble at Connecticut casinos. *Id.* at 14. One columnist even went so far as to label southeastern Connecticut "the embezzlement capital of the world." David Collins, *Counting Up Casino Impacts*, The Day (July 29, 2009).

An important feature of this phenomenon is the typical profile of the offender. A State's Attorney for New London County who worked on many embezzlement cases noted that he was "stunned" by the type of people committing the embezzlements. *Spectrum Report* at 146. According to the State's Attorney, they were people that "almost always never had a criminal record" and were "upstanding citizens who gained the trust of their employers." *Id.* These offenders included many residents in prominent positions within their communities, including, among others, the former mayor of Middletown, a tax collector for the town of Sprague, the former chief financial officer of the town of Darien, the Niantic postmaster, and a Manchester police sergeant. *Id.* at 144.

Casinos have this effect on otherwise law-abiding individuals because problem gambling is a disorder with a physiological basis. American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders*, § 312.31. Much like alcohol or drugs, gambling stimulates the brain's reward system, often leading to addiction. Mayo Clinic, *Compulsive Gambling*, Diseases and Conditions (Feb. 12, 2014), http:// mayoclinic.org/diseases-conditions/compulsive-gambling/basics/definition. While researchers have yet to determine exactly what causes someone to gamble compulsively, there are a number of factors shown to increase the risk of being a pathological gambler. These include substance abuse problems, mood or personality disorders, attention-deficit/hyperactivity disorder (ADHD), alcohol abuse, and prolonged or intense periods of stress or depression. *Id.*

In 2007, approximately one year before Mr. Recck committed the offense, he experienced many of the aforementioned risk factors. His marriage had soured. He was struggling at work. His mother, who had raised him by herself and had always been the "rock" in his life, became gravely ill and suffered immensely before finally passing away in 2009.[4] He had also been struggling with undiagnosed ADHD, depression, and trauma associated with the rescue efforts he participated in in the aftermath of September 11th. To cope with these hardships, Mr. Recck increasingly turned to gambling and drinking. He started going to Mohegan Sun and Foxwoods several times per week and betting progressively larger amounts of money. His losses began to add up, and eventually, he was no longer able to fund his gambling habit himself. Mr. Recck then joined the long list of formerly law-abiding Connecticut residents who embezzled funds to support their gambling addiction.

Mr. Recck has experienced and will continue to experience several consequences as a result of his actions. His wife Lori has left him. He lost his longtime home and a nearby rental property, both to foreclosure. He was fired from his job of seventeen years – a financial adviser for MetLife – and has been barred from ever again working in the financial and insurance industries. He is now a felon, and will be so branded for the rest of his life. As a result, he will have to deal with the many serious collateral consequences that accompany such a designation.

Having one's life fall apart in this manner would cause many people to reengage in the problematic behavior that led them to offend in the first place, but this has not been the case for Mr. Recck. Since entering treatment and confessing to his crimes, Mr. Recck has largely been able to refrain from gambling and drinking alcohol, and he continues to regularly see a therapist and participate in Gamblers Anonymous. He also successfully completed the Hartford Support

---

[4] Presentence Report ("PSR") ¶ 30.

Court Program, where he was regarded as a role model for other participants.[5]  Desperate to pay back what he owes, Mr. Recck took a job as a driver for a car service, a job considerably beneath his qualifications given his education and work history.  Rather than let his ego interfere with his desire to do right by those he has wronged, Mr. Recck has thrived at his new job, and has since been promoted to the company's manager of Midwest Operations.  As a result, every week, he is able to put a relatively significant portion of his earnings toward making restitution.[6]

Mr. Recck continues to seek the opportunity to make things right by repaying CCSAR in full for the funds he embezzled.  Accordingly, and for the reasons that follow, Mr. Recck respectfully requests that the Court impose a sentence of five years of probation, along with 300 hours of community service, and continued mental health treatment.  He also requests that the Court include in the judgment a requirement that he make restitution to the victim in full.  In light of the circumstances surrounding the offense, the subsequent fallout Mr. Recck has already endured, and Mr. Recck's ongoing extraordinary attempts at rehabilitation and making restitution, such a sentence is just, reasonable, and serves the purposes of a criminal sentence as set forth in 18 U.S.C. § 3553(a).

## I.  FACTUAL BACKGROUND

In order to understand how a man like Mr. Recck could commit the offense at issue in this case—that is, stealing money from an organization he loves—one must understand more about the mental and emotional conditions that predated his illegal conduct, and how those conditions triggered the gambling addiction that directly led to his behavior.  But what will likely be of more interest to the Court is not how this offense happened, but rather how, in the four

---

[5] *See* Exhibit A, Letter from Probation Officer Jonathan Sitek to the Court.
[6] *See* Exhibit B, Chart documenting restitution payments.

years since it concluded, Mr. Recck has taken meaningful steps to ensure that it will never happen again.

**A.      Mr. Recck was a hardworking, productive member of his community.**

Before Mr. Recck developed his gambling addiction, he was a model citizen who gave 100 percent of his efforts to his job and his community.  In fact, Mr. Recck recalls being teased by his friends for having no leisure time because during an average week, he would spend sixty-five to seventy hours working at his job as a financial adviser, and an additional fifteen to twenty hours volunteering with CCSAR.  When Mr. Recck did have free time, he dedicated it to cultivating a family life with his then-wife Lori, which included operating the family horse farm in Harwinton, Connecticut.

Mr. Recck's dedication to his job is evident in the strong relationships he built with his clients.  In Robert E. Corwin's letter to the Court, he says that Mr. Recck was always willing to go the extra mile to ensure that his clients were well-informed and taken care of:  "Not only did he answer my questions, but he drove halfway across Connecticut to sit with my wife and I to make sure we understood what he was talking about.  Thanks to his advice, we are well on our way to saving for my son's college fund."[7]  He also served as a mentor to others in the industry.  Andrew J. Gardner recalls:  "I have benefitted from his selfless nature in both my personal and business development over this past decade.  Tom supported many younger/newer advisors in their businesses—He gave up a large amount of time in order to mentor other people."[8]

---

[7] Exhibit C, Letter from Robert E. Corwin to the Court.  *See also* Exhibit V, Letter from Gary Somerset to the Court ("I will give you an example about Tom's integrity.  We were going over some of my existing retirement accounts thru [sic] another company and he advised me to keep one of the accounts as his company couldn't compete with the return.  Most financial advisors would not have been that honest.").

[8] Exhibit D, Letter from Andrew J. Gardner to the Court.

Likewise, Mr. Recck gave a lot of time and energy to CCSAR because he truly believed in the mission of the organization. He initially became involved in CCSAR in 1995, when a friend in the organization recommended it to him. He had always wanted to be a volunteer firefighter, and CCSAR piqued his interest. For the first few years, he was a regular member whose main responsibility was training rescue dogs, but eventually CCSAR co-founder, Alice Kugelman, recognized that he was skilled at money management, so she asked for his help with fundraising. In two years, Mr. Recck was able to fundraise $25,000, which allowed CCSAR to purchase its first vehicle, as well as an inflatable watercraft that has been used by numerous Connecticut police and fire department teams during search and rescue missions. Eventually, in recognition of this success, Mr. Recck was promoted to the Treasurer position at CCSAR.

Beyond his fundraising abilities, Mr. Recck was an integral part of many CCSAR search and rescue efforts, including in the aftermath of a plane crash in Hebron, Connecticut; John F. Kennedy, Jr.'s plane crash in Martha's Vineyard; Hurricane Katrina; and the September 11th terrorist attacks on the World Trade Center. The September 11th search and rescue mission was particularly memorable for Mr. Recck due to the sheer emotional and psychological impact it had on him. His then-wife Lori Kyer urged him not to go because she knew it would be a dangerous, grueling mission, but Mr. Recck felt that it was his civic duty to help the first responders in any way he could. Ms. Kyer remembers that "he was fearless in the face of people needing the help he was trained in [providing]," with "no pause for concern for his own safety or welfare."[9] In describing his own experience during that mission, Mr. Recck said:

> Dave Morgan [a former CCSAR member] and I worked the night shift at ground zero every other night until October 8th. This was the search that I saw what I really never wanted to see: body part[s], firemen and police officers breaking down all around us. We spen[t] a lot of nights just

[9] Exhibit E, Letter from Lori Kyer to the Court.

listening to these brave men and women tell their stories. Dave and I believe some of the most good we did at ground zero was just listen. Up to this point, I ha[d] seen bodies with their heads blown off, who were in the water for days, [who] were out in the heat for days. I thought I saw it all until the evening of September 18th, when Dave Morgan and I were requested to be in charge of a team of well over 200 [rescuers]. Dave took the lead of the team digging across the pile, while I took the lead of the team digging down. We never gave up until 3 hours later, when Dave and I's tunnel[s] meet where the victim was found.

Mr. Recck reports that while his experience at ground zero was rewarding, it was also traumatic and negatively impacted his emotional well-being. However, he never sought any help for dealing with this issue until he checked himself into the Institute of the Living over a decade later. Rather, he continued to be a dedicated, loyal member of CCSAR until the offense. Mr. Recck asserts that, despite his eventual bad decisions, he wholeheartedly believed in the organization's work and "CCSAR was [his] life."

**B.    A series of hardships and traumatic experiences triggered Mr. Recck's gambling and alcohol addiction, which led to his offense.**

In 2007 and 2008, Mr. Recck experienced a series of additional hardships in rapid succession: the global financial crisis hit the insurance industry hard, putting immense pressure on Mr. Recck at work; his loving marriage began to sour due to irreconcilable differences; and his mother, with whom he was very close, fell very ill and passed away. Altogether, these stressful incidents triggered a latent predisposition for addictive behavior, and Mr. Recck did not have the tools to cope with these triggers in a healthy manner. *See* Richard T.A. Wood & Mark D. Griffiths, *A Qualitative Investigation of Problem Gambling as an Escape-Based Coping Strategy*, 80 Psychol. & Psychotherapy 107 (2007) (describing compulsive gambling as a poor coping mechanism for individuals seeking to "escape" stressful circumstances in their lives).

Perhaps the most traumatic of these experiences for Mr. Recck was the death of his mother. Of course, the death of a parent is a difficult event in any person's life, but it was

particularly significant for Mr. Recck because of his close relationship with his mother and his reliance on her for emotional support.  Mr. Recck's parents divorced when he was young due to his father's extramarital affair, and his relationship with his father had become strained; they kept in contact "on and off over the years."[10]  As a result, Mr. Recck relied heavily on his mother for support and guidance.  According to Mr. Recck, "[s]he was the center of the family and kept everything going."[11]  Normally, Mr. Recck would have turned to her when he was having problems at work or in his marriage.  In her absence, he felt lost and increasingly distraught.  Eventually, he found that the combination of alcohol and gambling was a form of escape from all the negative emotions he was experiencing.  He described the casinos as "a place [he] went to get away from everything.  There was a lot of drinking involved."[12]  Unfortunately, what began as a distraction soon became a pathological addiction, which eventually lead Mr. Recck down a very dark road.

Once his gambling became compulsive and uncontrollable, Mr. Recck started losing large sums of money.  At first, he tried to impose strict limits on himself, only betting $300 to $400 per night, but eventually, he started bringing credit cards, debit cards, and checks to the casinos to cover his losses.  As the losses grew increasingly unmanageable, he felt desperate and anxious.  That is when he realized he could take funds from CCSAR to pay off what he owed.  In his state of addiction, he truly believed that he could win the money back and replace the funds. *See* Bryan Gibson & David M. Sanbonmatsu, *Optimism, Pessimism, and Gambling:  The Downside of Optimism*, 30 Personality Social Psychol. Bull. 149 (2004) (finding a correlation

---

[10] PSR ¶ 30.
[11] *Id.*
[12] *Id.* at 37.

between problematic gambling behaviors and irrational optimism about future outcomes). Of course, he was not able to do so, and he ended up causing significant harm to the organization.

## C.    Mr. Recck's post-offense behavior demonstrates substantial growth and rehabilitation.

Even before he confessed to the offense on September 15, 2012, Mr. Recck began taking steps to address his problematic gambling and to try to make amends. In May 2012, he admitted himself to the Wheeler Clinic and began seeing Patricia Devendorf on a weekly basis to take part in the Bettor Choice Gambling program.[13] Still early in his recovery, he nevertheless drastically reduced the amount he was gambling. He created a plan to pay back the money he owed and began doing so between May and September 2012. According to the forensic accounting report conducted by CCSAR, Mr. Recck made at least seven repayments totaling $2,300 prior to his confession and discovery of his offense.

After confessing to the offense on September 15, 2012, Mr. Recck took additional, significant steps toward rehabilitating himself and making amends for the harm he caused. On October 3, 2012, he admitted himself to the Institute of the Living ("IOL") after sending a series of text messages to friends suggesting suicidal ideation. *See* Exhibit I. He remained at the IOL on an in-patient basis from October 3 to October 10, 2012. He was diagnosed with major depressive disorder (severe, without psychotic features), pathological gambling, and alcohol abuse.[14] He received multidisciplinary treatment interventions including pharmacotherapy, group psychotherapy, dialectical behavioral therapy, and cognitive behavioral therapy. Upon discharge from the residential program, Mr. Recck was referred to the partial hospitalization unit at IOL where he attended for 11 visits engaging in the same multidisciplinary course of

---

[13] PSR ¶ 37.
[14] Exhibit I, Excerpt from Hartford Hospital/IOL records.

treatment.  Thereafter, he successfully completed the intensive outpatient level of treatment at the IOL for 12 visits.  Following completion of all levels of treatment at IOL, Mr. Recck was referred to an outpatient level of care at the Wheeler Clinic to address his pathological gambling addiction through weekly individual therapy and was referred to APRN Diane Bray for continued medication maintenance and therapy regarding his depression, anxiety, and trauma.

Mr. Recck has regularly been attending individual therapy sessions through the Bettor Choice Gambling Treatment Program at the Wheeler Clinic for over four years.  His therapist, Ms. Devendorf, has praised Mr. Recck's commitment to the rehabilitative process, noting that Mr. Recck "continues to make very good progress on his treatment plan goals and objectives" and that he "has maintained abstinence/recovery from gambling for over two years."[15]  She also notes that Mr. Recck "recognizes the seriousness of and takes responsibility for his actions along with taking the steps necessary to recover and move forward."[16]  Finally, she believes that, as long as Mr. Recck continues to receive treatment and "work a recovery program" in the manner that he has thus far, "re-offending is not likely."[17]

In addition to his ongoing psychotherapy treatment, Mr. Recck has become deeply involved in Gamblers Anonymous.  He attends multiple meetings each week, and has developed a robust support network as a result.  After relocating to Cincinnati, he continued his involvement with the program, with one attendee noting that he "has become a vital part of our group."[18]  Mr. Recck has also taken on a leadership role within the program, helping "numerous new people to handle their gambling addiction" and even offering positions as drivers with his

---

[15] Exhibit F, Letter from Patricia Devendorf to Probation Officer Sitek.
[16] *Id.*
[17] *Id.*
[18] Exhibit G, Letter from Mark Brandewiede to the Court.

employer to Gamblers Anonymous attendees in need of work.[19]  More recently, he has expressed

desire to become even more involved in the program by becoming a "secretary" or "chairperson"

at meetings.[20]

In addition, on August 24, 2016, Mr. Recck graduated from the Hartford Support Court

program.  Participation required at-first weekly and then bi-monthly attendance at court

meetings, weekly treatment, weekly contact with the U.S. Probation Office, regular drug and

alcohol testing, and daily journaling.  As a part of the program, Mr. Recck devised his own

"sobriety accountability plan," which, according to his probation officer, he "flawlessly

executed."[21]  This included writing regular journal entries, which "were not meaningless, but

were indicative of a person who was introspective, and truly examining his situation, his thought

processes, and his recovery," and were "used as examples to other participants throughout the

program."[22]  In discussions with the Support Court team and other participants, Mr. Recck "was

remarkably open" and expressed his intent to continue on his current path "not to better himself

financially, but to pay back his debt, and to seek new relationships."[23]  According to his

probation officer, throughout the program, Mr. Recck demonstrated "exactly [the] type of

prosocial activity, self-assessment, and openness in admitting one's mistakes that the Support

Court team hopes to instill in a person."[24]

Mr. Recck has also found and maintained steady employment since the offense.  Initially,

he found employment in the insurance industry, but that fell through when he lost his insurance

---

[19] *Id.* (stating that Mr. Recck "has also offered employment to those who need it in our program").
[20] *Id.*
[21] Exhibit A, Letter from Probation Officer Jonathan Sitek to the Court.
[22] *Id.*
[23] *Id.*
[24] *Id.*

licenses (in addition to the financial licenses he had already lost). In 2013, he was hired as a driver by the start-up company, AmRide Personal Driver Services, LLC. Despite earning a fraction of his former salary, Mr. Recck committed himself to the position, and "his work ethic and customer service skills led him to the top of the driver pool."[25] In 2015, AmRide expanded to Cincinnati, and Mr. Recck was promoted to manage the company's operations there. He now manages a team of over twenty drivers and more than 1,000 customers.[26]

Mr. Recck's employment has enabled him to pay restitution to the victim on a consistent basis. Since being promoted in 2015, Mr. Recck has made weekly payments to CCSAR, with only a few exceptions.[27] These payments are a significant portion of his salary. After allotting for food, rent, and other personal expenses, Mr. Recck devotes the remainder of each paycheck he receives to restitution. He is determined to continue doing so regardless of his salary.

Finally, and perhaps most importantly, in the four years since Mr. Recck voluntarily ceased the offense conduct, confessed to the victim, and sought help for his gambling disorder and mental health issues, Mr. Recck has not reoffended and has not had even a single violation of pre-trial release. He has lived a law-abiding life, both in the two years before he became aware that he would be prosecuted and was subject to formal supervision, as well as after. In short, he has been both a model citizen and a model supervisee.

## II. LEGAL ARGUMENT

The Probation Officer has calculated an advisory guideline range of 21 to 27 months, resulting from an adjusted offense level of 16 and Criminal History Category I. While the Court

---

[25] Exhibit H, Letter from Rene Rodriguez to the Court.
[26] *Id.*
[27] Exhibit B, Chart documenting restitution payments. The exceptions are primarily from the time that Mr. Recck was relocating from Connecticut to Ohio for work, and needed the extra funds for that purpose.

is required to consider the range of penalties suggested by the Sentencing Guidelines in determining the appropriate sentence in a given case, it is certainly not bound by that range. *See United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005). Indeed, the Supreme Court has repeatedly reminded sentencing courts that: "The Guidelines are not only *not mandatory* on sentencing courts; they are also not to be *presumed* reasonable." *Nelson v. United States*, 129 S. Ct. 891, 892 (2009); *see also Rita v. United States*, 127 S. Ct. 2456, 2465 (2007) (emphasizing that the only "presumption of reasonableness" that applies to a guideline sentence is "an appellate court presumption," not applicable in the initial sentencing analysis conducted by the District Court). Thus, while the Court must consider the recommendations of the Guidelines, the Court may not presume that those recommendations are reasonable. Instead, the Court must treat the recommended guideline range as only one among numerous factors.

The sentence that Mr. Recck requests is a below-guideline sentence. There are at least five bases to support such a sentence. These include that: (1) Mr. Recck's mental and emotional conditions, his lack of a prior or subsequent criminal history, his post-offense conduct, and his non-venal motive for committing the offense make him an extraordinary defendant; (2) the guideline range in this case is not based on empirical evidence or national experience, and fails to promote any purpose of sentencing; (3) a probationary sentence adequately satisfies the goals of sentencing; (4) a sentence of imprisonment would not only be greater than necessary, but would run counter to the goals of sentencing; and (5) a probationary sentence will better enable Mr. Recck to continue to make restitution to the victim.

**A.** **Several aspects of the offense and Mr. Recck's history and characteristics justify a downward departure or a below-guideline sentence.**

"It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the

human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Koon v. United States*, 518 U.S. 81, 113 (1996). In this instance, the particular circumstances of Mr. Recck's offense, as well as his background and post-offense behavior, lead to the conclusion that a guideline sentence would be inappropriate.

### i. Mr. Recck's mental and emotional condition contributed significantly to the offense.

Mr. Recck's mental and emotional condition at the time of the offense distinguishes this case from a typical case covered by the Guidelines and provides a basis for granting a downward departure or variance. Pursuant to USSG § 5H1.3, "mental and emotional conditions may be relevant in determining whether a departure is warranted, if such conditions, individually or in combination with other offender characteristics, are present to an unusual degree and distinguish the case from the typical cases covered by the guidelines."

Mr. Recck has been diagnosed with pathological gambling disorder, triggered by ADHD, major depressive disorder, trauma, and alcohol abuse.[28] Due to Mr. Recck's lack of control over his gambling behavior, his impulsivity, and his inability to refrain from chasing his losses, he embezzled funds from CCSAR. Although USSG § 5H1.4 notes that addiction to gambling itself is not a basis for a downward departure, Mr. Recck's mental health condition is not so simple: there were deep psychological issues underlying the addiction, and these conditions were "unusual" when considered in the aggregate.[29] Mr. Recck's gambling addiction was further complicated by a co-occurring addiction to alcohol, which went hand-in-hand with his

---

[28] Exhibit I, Excerpt from Hartford Hospital/IOL Records.
[29] *See, e.g.*, Exhibit AA, Letter from Matthew Wiley to the Court ("It is my belief that Tom is the classic case where mental illness (one that his twin brother shared) is exacerbated by a tough situation as the walls close in . . . . The speed of his fall only reaffirms my belief that while Tom committed a serious crime, his illness was a contributing factor.").

problematic gambling. Pursuant to USSG § 5H1.4, a downward departure based upon alcohol addiction is permitted in order to accomplish a treatment objective. Mr. Recck has been addressing those root causes of his addiction via medication,[30] intensive psychotherapy, group treatment, Support Court, and abstinence from alcohol. He is also learning healthier methods of coping with these conditions that don't involve addictive behavior.

Mr. Recck's mental and emotional condition, in combination with his alcohol addiction, was the underlying cause of his problematic gambling, which directly led to the offense conduct in this case. Mr. Recck respectfully suggests that a downward departure is necessary to account for the presence of these conditions and their causal role in the eventual criminal behavior. Moreover, Mr. Recck has sought out extensive and continual treatment to address the root cause of these issues and to prevent the possibility of re-offending.

### ii.     Mr. Recck has demonstrated extraordinary acceptance of responsibility.

In mid-2012, Mr. Recck began to recognize that his gambling habits were becoming increasingly problematic and that he needed to get his behavior under control. He initiated treatment at the Wheeler Clinic to tackle his addiction and begin the path of addressing his mistakes.[31] In August 2012, he admitted to the administration of CCSAR that he had been taking funds from the organization. He created a plan to begin paying restitution to CCSAR and started making payments. Once his case formally entered the legal system, he continued to make restitution payments on a near-weekly basis. He even listed CCSAR as the beneficiary on a life insurance plan that he owned at the time.

---

[30] *Id.* Mr. Recck is currently still taking a daily dose of anti-depressant medication.
[31] *See* Exhibit J, Excerpt from Wheeler Clinic records.

Once the government became involved, Mr. Recck willingly and openly assisted authorities in the investigation and prosecution of his misconduct.[32]  He understands that his behavior caused great harm to an organization that he cares about, and he feels tremendous remorse and shame regarding his actions.  In his letter to the Court, Mr. Recck wrote, "[N]ot a day goes by that I don't think about the harm I have cause[d] to both Connecticut Canine Search and Rescue and my former employer MetLife."[33]

Given that Mr. Recck had begun to take responsibility for his behavior before formal legal action was brought against him, he is extraordinary among typical defendants facing similar charges, and should be sentenced accordingly.  *See United States v. Lieberman*, 971 F.2d 989, 996 (3d Cir. 1992) (granting a downward departure because the offender demonstrated a "degree of acceptance of responsibility that is substantially in excess of that ordinarily present"); *United States v. Garlich*, 951 F.2d 161 (3d Cir. 1992) ("A defendant's voluntary payment of restitution before adjudication of guilt is a factor considered in determining whether the defendant qualifies for a two-level reduction for acceptance of responsibility."); *United States v. DeMonte*, 25 F.3d 343 (6th Cir. 1994) (granting downward departure to offender who admitted to committing an undiscovered crime); *United States v. Fagan*, 162 F.3d 1280, 1284-85 (10th Cir. 1998) ("[A] sentencing court may depart downward if it finds that remorse is present to an exceptional degree.").

### iii.    Mr. Recck has made extraordinary post-offense efforts at rehabilitation.

Mr. Recck's post-offense transformation has been remarkable.  Through his hard work with Patricia Devendorf, Program Manager of the Bettor Choice Gambling Treatment Program

---

[32] PSR ¶ 25.
[33] Exhibit K, Letter from Thomas Recck to the Court.

at the Wheeler Clinic, and with Gamblers Anonymous, he has been able to manage his addictions and turn his life around. Mr. Recck started treatment voluntarily when he recognized that he had a gambling problem and has continued receiving treatment despite moving to a different state and starting a new job. In Ms. Devendorf's letter to Mr. Recck's probation officer, she notes his diligence and dedication to the recovery process, and comments that "Mr. Recck recognizes the seriousness of and takes responsibility for his actions along with taking the steps necessary to recover and move forward."[34] His participation in Gamblers Anonymous has also been effective in managing his addiction: it has now been over two and a half years since he last gambled thanks to his active participation in the program,[35] and he recognizes that "attending meeting[s] will become a life long journey" for him.[36]

Mr. Recck was also very grateful for the opportunity to participate in the Hartford Support Court Program, which he not only completed, but excelled in. Even though he lived out of state for part of his time in Support Court, he travelled back and forth from Ohio to Connecticut for the chance to attend sessions, and he kept in constant contact with his probation officer throughout the program. Probation Officer Jonathan Sitek's letter to the Court reveals that Mr. Recck was "an excellent participant" who "graduated with flying colors" and stood as an "example to the other participants."[37] He "was consistent with his journal entries," which "were not meaningless, but were indicative of a person who was introspective, and truly examining his situation, his thought processes, and his recovery."[38] He was also very active in sharing his recovery with others: in sessions, he "formally led a discussion on journaling, in

---

[34] Exhibit F, Letter from Dr. Patricia Devendorf to Probation Officer Jonathan Sitek.
[35] Exhibit L, Letter from James D. commemorating two years of abstinence from gambling.
[36] Exhibit K, Letter from Thomas Recck to the Court.
[37] Exhibit A, Letter from Probation Officer Jonathan Sitek to the Court.
[38] *Id.*

addition to another discussion on his personal story, and how perseverance and open-mindedness can help a person move forward in their journey."[39]  As evidenced by Mr. Recck's thoughtful involvement, he used his time in the program as an opportunity to genuinely confront and tackle the issues impacting his recovery.  Specifically, he also used it as a chance to reach out to his father and mend their strained relationship.  Mr. Recck and his father now see each other on a monthly basis, and his father is able to offer his support and guidance.[40]

Mr. Recck's desire to rehabilitate himself and make amends is perhaps most transparent in the tremendous professional strides he has recently made.  When Mr. Recck lost his job at MetLife as a result of committing the offense, he was devastated, but he did not let this get in the way of his rehabilitation.  He remained determined to rebuild his life and to repay CCSAR, and found a new job as a driver for AmRide.  He accepted this opportunity with humility and gratitude; he was solely focused on putting his life back together and paying back what he owed.  Shortly thereafter, Mr. Recck was recognized by the leadership of AmRide for his work ethic and leadership skills, and was promoted to the role of "Manager" in Cincinnati.  He now manages a team of twenty-five drivers and interfaces with over one thousand customers.[41]  The CEO of AmRide, Rene Rodriguez, reports "nothing but positive results" from Mr. Recck and his team.[42]  Although he is making a fraction of the money that he made in his previous career, he is living modestly in order to repay CCSAR as quickly as possible.

The sincerity of Mr. Recck's efforts at rehabilitation is substantiated by the many letters of support the Court has received.  He has a network of individuals supporting him, including his

_____

[39] *Id.*
[40] Exhibit W, Letter from George Recck to the Court.
[41] Exhibit H, Letter from Rene Rodriguez to the Court.
[42] *Id.*

therapist, fellow Gamblers Anonymous members, family members, and his coworkers, and they strongly believe that he is capable of continuing down the path of recovery and growth. *See, e.g.*, Exhibit M, Letter from Patricia Devendorf to the Court ("Mr. Recck has consistently maintained a strong commitment to treatment and recovery and he has made significant progress over the past 4 years . . . . [H]e knows he must continue to work an ongoing recovery program . . . . [H]e has developed the necessary skills to do so."); Exhibit N, Letter from Timothy Idol to the Court ("It is clear to me that Mr. Recck not only can put his difficult past behind him, but he is honestly and sincerely working very hard to do just that."); Exhibit G, Letter from Mark Brandewiede to the Court ("He realizes the wrongs that he has done and has been eager to make amends.").[43] The Second Circuit has established that such genuine, sustained efforts at rehabilitation are generally legitimate grounds for significant downward departures. *See United States v. Maier*, 975 F.2d 944 (2d Cir. 1992) (granting downward departure for a defendant's "uneven" yet genuine efforts to quit a drug addiction); *United States v. Core*, 125 F.3d 74, 77 (2d Cir. 1997) ("We observed that 'awareness of one's circumstances and the demonstrated willingness to act to achieve rehabilitation, thereby benefiting the individual and society,' can remove a case from the heartland of typical cases, thus constituting a valid basis for departure.") (quoting *Maier*); *United States v. Workman*, 80 F. 3d 688, 701 (2d Cir. 1996) ("[P]ost arrest rehabilitation efforts by . . . defendants may justify downward departures under appropriate circumstances.").

---

[43] *See also* Exhibit R, Letter from Anthony G. Recck to the Court; Exhibit S, Letter from Brenda Marsiglia to the Court; Exhibit T, Letter from Donna M. Brusky to the Court; Exhibit U, Letter from Edi Rapo to the Court; Exhibit W, Letter from George Recck to the Court; Exhibit Y, Letter from Kayla M. Recck to the Court; Exhibit BB, Letter from Teri Kucka to the Court; Exhibit X, Letter from Jacob Khyberry to the Court.

Finally, as part of his efforts at rehabilitation, Mr. Recck has been making regular restitution payments to compensate for the funds he stole. Every week, he puts all of the money he is able to save up—typically anywhere from $20 to $50[44]—towards this purpose, which is a significant accomplishment for somebody in Mr. Recck's shoes. In her years of practice, undersigned counsel has never represented a client who has made consistent, incremental restitution payments the way Mr. Recck has. Every time he does so, he is directly facing the ramifications of his crime and atoning for the harm he has caused. In an interview with his probation officer, "Mr. Recck reported that his primary goal for the future is to take care of his restitution obligation as quickly as possible and added, 'I've been paying, not as much as I'd like, but any raise that I get is more that I can pay toward restitution. When I was in finance, I drank the Cool-Ade [sic] of that culture, needed tailored suits and things. Now I live a very lean lifestyle and am enjoying things for free, such as hiking, running, etc.'"[45] Most offenders in Mr. Recck's position are capable of expressing remorse, but few of them can back their claims up with concrete action. By making regular restitution payments, Mr. Recck is putting his money where his mouth is.

### iv. Mr. Recck has no prior criminal history.

Prior to the series of traumatic events that triggered Mr. Recck's gambling addiction, he was a productive, law-abiding member of society for over forty years. He had a healthy family life and a stable job, and he performed very productive community service through his involvement in CCSAR. His complete lack of prior criminal history indicates that he has a strong character and poses a very low risk to the public. Accordingly, a sentence of

---

[44] Exhibit B, Chart documenting restitution payments.
[45] PSR ¶ 47.

imprisonment within the guideline range would be unnecessarily excessive in the context of this specific case. In *United States v. Mishoe*, 241 F.3d 214, 220 (2d Cir. 2001), the Second Circuit stated:

> Obviously, a major reason for imposing an especially long sentence upon those who have committed prior offenses is to achieve a deterrent effect that the prior punishments failed to achieve. That reason requires an appropriate relationship between the sentence for the current offense and the sentences . . . for the prior offenses.

While the *Mishoe* decision principally addressed the Career Offender Guidelines, the teaching of that decision applies here. Specifically, the concept of incremental punishment is relevant to the sentencing goal of deterrence. Where an individual has never been incarcerated before, a probationary sentence may be adequate in providing deterrent effects. *See also United States v. D.M.*, 942 F. Supp. 2d 327, 339 (E.D.N.Y. 2013) (sentencing a defendant to probation partially because his lack of criminal history suggests "that he is of low risk of re-offense"); *United States v. Aref*, 2007 WL 804814 at *3 (N.D.N.Y. 2007) ("Based upon [defendant's] lack of prior criminal history, and his personal characteristics, the Court finds his circumstances to be extraordinary and that a downward departure is warranted to a criminal history category of I."). Mr. Recck's low risk to the public has also been made clear by his behavior since the offense. It has now been four years since he confessed to the offense, and he has not engaged in any further criminal behavior.

Furthermore, prison has a more significant effect on individuals who are imprisoned for the first time. *See, e.g.*, *United States v. Baker*, 445 F.3d 987, 992 (2006) (confirming the district court's finding that "a prison term would mean more to [a first-time offender] than to a defendant who previously had been imprisoned"). For instance, imprisonment can cause significant psychological trauma and instill a higher propensity towards criminal behavior. *See* Jose Cid, *Is*

*Imprisonment Criminogenic?  A Comparative Study of Recidivism Rates Between Prison and Suspended Prison Sanctions*, 6 Eur. J. Criminology 459 (2009); Lynne M. Vieraitis, et al., *The Criminogenic Effects of Imprisonment:  Evidence from State Panel Data, 1974–2002*, 6 Criminology Pub. Pol'y 589 (2007).  For Mr. Recck, a first-time offender who has already endured significant adversity, such a sentence would potentially be very destructive.

**v.      Mr. Recck's motive for committing the offense was not venal.**

The Court should consider a broad range of mitigating factors in sentencing Mr. Recck, and "the defendant's motive for committing the offense is one important factor," although it is not a technical grounds for departure.  *Wisconsin v. Mitchell*, 508 U.S. 476, 485 (1993) (establishing the notion that crimes motivated by pecuniary gain ought to be punished more harshly than crimes without such a motive).  In taking money from CCSAR, Mr. Recck was not motivated by greed or animus, nor did he have any intention to permanently steal the funds.  Rather, he took the money at a time when he was desperate and overwhelmed by his gambling losses.  He intended only to borrow the funds and replace them as soon as he was able.  However, like many other facets of Mr. Recck's life, this plan spun out of his control as his gambling addiction progressed.

Since Mr. Recck never utilized the stolen funds for anything other than gambling,[46] and was previously a very loyal and productive member of CCSAR, his offense is clearly a byproduct of addiction, rather than the type of criminal intent that the Guidelines are meant to address.  *United States v. Hicks*, 985 F. Supp. 2d 1307, 1310-11 (M.D. Ala. 2013) (granting a

---

[46] The win/loss statements from Foxwoods and Mohegan Sun casinos alone indicate that Mr. Recck accrued approximately $80,000 in losses.  However, these statements provide an incomplete record because they do not capture his numerous gambling transactions made without a rewards card, or Mr. Recck's gambling transactions at other casinos.

downward variance because defendant's theft was motivated by his addiction to gambling and alcohol, rather than greed). *See also United States v. Connors*, 2007 WL 2955612 at *3-4 (E.D. Penn. 2007) (granting a downward variance since the "lack of personal profit and the defendant's motivation were relevant . . . and could be considered along with all other appropriate factors regarding sentencing disparity"); *United States v. Ranum*, 353 F. Supp. 2d 984 (E.D. Wis. 2005) (granting a below-guideline sentence because the guidelines do "not properly account for defendant's absence of interest in personal gain . . . [and] otherwise outstanding character").

**B.      The guideline range in this case provides no useful advice because it is not based on empirical evidence or national experience, and fails to promote any purpose of sentencing.**

When Congress enacted the Sentencing Reform Act of 1984, it directed the Commission to promulgate guidelines that "assure the meeting of the purposes of sentencing," 28 U.S.C. § 991(b)(1)(A), and to use average sentences imposed and prison time actually served in the pre-guidelines period as a "starting point." 28 U.S.C. § 994(m). The Commission was then to continually review and revise the Guidelines in light of sentencing data, criminological research, and consultation with frontline actors in the criminal justice system. 28 U.S.C. § 991(b)(1)(C), § 991(b)(2), § 994(o), § 995(13), (15), (16). The original Commissioners abandoned the effort to design the Guidelines based on the purposes of sentencing because they could not agree on which purposes should predominate, and instead based the Guidelines on an empirical study of time served for various offenses before the Guidelines. *See* USSG, Ch. 1 Pt. A(3); Stephen Breyer, J., *The Federal Sentencing Guidelines and the Key Compromises Upon Which They Rest*, 17 Hofstra L. Rev. 1, 7 (1988).

In *Rita v. United States*, the Supreme Court offered two reasons for why it may be "fair to assume" that the Guidelines "reflect a rough approximation" of sentences that "might achieve §

3553(a)'s objectives." 551 U.S. 338, 350 (2007). First, the original Commission used an "empirical approach" which began with an "examination of 10,000 presentence reports setting forth what judges had done in the past." Second, the Court noted that the Commission could review and revise the Guidelines based on judicial feedback through sentencing decisions, and consultation with other frontline actors, civil liberties groups, and experts. *Id.* at 348-50.

The Court recognized, however, that not all guidelines were developed in this manner. *See Gall v. United States*, 552 U.S. 38, 46 & n.2 (2007); *Kimbrough v. United States*, 552 U.S. 85, 96 (2007). When a guideline "do[es] not exemplify the Commission's exercise of its characteristic institutional role," because the Commission "did not take account of 'empirical data and national experience,'" the sentencing court is free to conclude that the guideline "yields a sentence 'greater than necessary' to achieve § 3553(a)'s purposes, even in a mine-run case." *Kimbrough*, 552 U.S. at 109-10.

The fraud guideline used to calculate Mr. Recck's advisory sentence range is not based on empirical data regarding past practice or on national experience. Because the Commission failed to rely on empirical data or national experience in promulgating or amending § 2B1.1, this Court is free to disagree, on reasoned policy grounds, with its recommendation. *See Spears v. United States*, 555 U.S. 261, 264-65 (2009); *Kimbrough*, 552 U.S. at 101-02, 109-10; *Rita*, 551 U.S. at 351, 357.

i.       **Mr. Recck's guideline range is significantly longer than the average "past practice" sentence and the original guideline range.**

Mr. Recck's guideline range is 21 to 27 months. Before the Guidelines, first offenders convicted of sophisticated fraud involving an equivalent loss amount who were sentenced to prison served, on average, 12 to 18 months, and thirty-five percent of such defendants received probation. *See Supplementary Report on the Initial Sentencing Guidelines and Policy*

*Statements*, U.S. Sent'g Comm'n 33 (June 19, 1987), http://www.srcproject.org/wpcontent/pdfs/reports/USSC_Supplementary%20Report.pdf.

When the Commission adopted the original Guidelines in 1987, it "decided to abandon the touchstone of prior past practice" with respect to white-collar offenses.  Breyer, J., *supra*, at 22-23.  The Commission required some form of confinement for all but the least serious cases, and adopted a fraud guideline requiring no less than 0 to 6 months and no more than 30 to 37 months for defendants in Criminal History Category I.  *See* USSG § 2F1.1 (1987).  The Commission explained that "the definite prospect of prison, though the term is short, will act as a significant deterrent to many of these crimes, particularly when compared with the status quo where probation, not prison, is the norm."  USSG, ch. 1, intro., pt. 4(d) (1987); *see also Fifteen Years of Guidelines Sentencing:  An Assessment of How Well the Federal Criminal Justice System is Achieving the Goals of Sentencing Reform*, U.S. Sent'g Comm'n 56 (2004), http://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-projects-and-surveys/miscellaneous/15-year-study/15_year_study_full.pdf (suggesting that the Commission sought to ensure that white collar offenders faced "short but definite period[s] of confinement") [hereinafter "*Fifteen Year Report*"].

Yet, the Commission's deterrence rationale was not based on empirical evidence.  As discussed above, empirical research regarding white-collar offenders demonstrates no difference between the deterrent effect of probation and that of imprisonment.  Moreover, the Commission quickly abandoned its original goal of ensuring "short but definite" sentences.  Beginning just two years after the Guidelines went into effect, prison sentences for fraud offenders were steadily increased.  The effect of those increases on this case was to add one level for loss in 1989, to add three more levels for loss in 2001, and to increase the base offense level by one in 2003.  As a

result of these increases, Mr. Recck's advisory guideline range is now more than twice what it would have been under the original guideline.

ii. **Four levels were added for the amount of loss in this case without any basis in empirical data or national experience and without any demonstrated need to further any purpose of sentencing.**

In 1989, two years after the Guidelines went into effect, one level was added for a loss amount of $125,000 to $150,000. USSG, App. C, Amend. 154 (Nov. 1, 1989). As the official reason for the amendment, the Commission stated only that it sought to "increase the offense levels for offenses with larger losses to provide additional deterrence and better reflect the seriousness of the conduct." *Id.* This reason was soon refuted. According to former Commissioner Michael K. Block and former Deputy Chief Counsel Jeffrey S. Parker, the Justice Department's *ex-officio* member of the Commission had persuaded four of six Commissioners "that recent congressional enactments had given oblique 'signals' to the Commission to increase fraud penalties," when the statutes "said no such thing." Jeffery S. Parker & Michael K. Block, *The Sentencing Commission, P.M. (Post-Mistretta): Sunshine or Sunset?*, 27 Am. Crim. L. Rev. 289, 319 (1989). The Commission "gratuitously" increased punishment for larger fraud cases for reasons that were "overtly political and inexpert," and abandoned its statutory mandates by failing to rely on its own data, failing to measure the effectiveness or efficiency of Guidelines sentences, and failing to provide analysis of prison impact. *Id.* at 318-20.

In 2001, another three levels were added for a loss amount of $125,000 to $150,000 as part of the Commission's Economic Crimes Package. USSG, App. C, Amend. 617 (Nov. 1, 2001). As the official reason for this amendment, the Commission stated that it was responding to "comments received from the Department of Justice, the Criminal Law Committee of the Judicial Conference, and others, that [the fraud guideline] under-punish[es] individuals involved

in moderate and high loss amounts, relative to penalty levels for offenses of similar seriousness sentenced under other guidelines." *Id.* While the Commission did not identify the "other guidelines" to which it was referring, it is clear from the proceedings upon which the amendment was based that it referred to the drug guidelines. At the Commission's Economic Crimes Symposium in 2000, a formal question was posed and provided in writing: "[I]f there is a current problem with the guidelines that is in need of repair, is it that fraud and theft are punished too leniently or that drug crimes are punished too harshly?" *Symposium on Federal Sentencing Policy for Economic Crimes and New Technology Offenses*, U.S. Sent'g Comm'n 54 (2000), http://www.ussc.gov/research/research-and-publications/research-projects-and-surveys/united-states-sentencing-commissionsymposium-federal-sentencing-policy-economic-crimes-and-new [hereinafter "Economic Crimes Symposium"]. Speaking on behalf of the Department of Justice, and in response to the moderator's question asking whether economic crimes should be "punished in the same way that we punish drug offenders," *id.* at 55, Assistant Attorney General James K. Robinson stated that "sentences for economic crimes should not be set, in our view, to match sentences for drug crimes," *id.* at 59, but should be set "in terms of the need to fulfill the purposes of sentencing." *Id.* at 58. Judge J. Phil Gilbert, speaking on behalf of the Criminal Law Committee of the Judicial Conference, stated that drug crimes and high loss fraud offenses cannot be compared because they are "apples and oranges." *Id.* at 56.

The explanations offered by the Commission for the two amendments that added four offense levels in this case are thus deficient and inaccurate. In both instances, the Commission amended the guideline not in the exercise of its characteristic institutional role as an independent expert body, but instead based on unsupported rationales. The Commission ignored the overwhelming empirical research demonstrating that increases in sentence severity have no

deterrent value, and it ignored the actual feedback from the district courts. Though the Guidelines explicitly allowed (and still allow) for *upward* departures when the amount of loss does not "fully capture the harmfulness and seriousness of the conduct," USSG § 2F1.1 comment. (n.11) (2000), the sentencing courts granted upward departures in only 1.2 percent of cases sentenced under § 2F1.1 in the year 2000, while they granted downward departures in 11.2 percent of cases and another 19 percent received departures for substantial assistance. *See 2000 Sourcebook of Federal Sentencing Statistics,* U.S. Sent'g Comm'n tbl. 28 (2000). This feedback from judges, the institutional actors best suited to make sentencing determinations, did not support any increase.

Moreover, while the amount of "loss" is the primary determinant of the offense level for fraud offenders, loss is a highly imperfect measure of the seriousness of an offense. *See United States v. Gupta*, 904 F. Supp. 2d 349, 351 (S.D.N.Y. 2012) ("By making a Guidelines sentence turn, for all practical purposes, on this single factor [the amount of monetary loss or gain occasioned by the offense], the Sentencing Commission effectively ignored the statutory requirement that federal sentencing take many factors into account, *see* 18 U.S.C. § 3553(a), and by contrast effectively guaranteed that many such sentences would be irrational on their face."); *United States v. Adelson*, 441 F. Supp. 2d 506, 509 (S.D.N.Y. 2006) (criticizing "the inordinate emphasis that the Sentencing Guidelines place in fraud on the amount of actual or intended financial loss" without any explanation of "why it is appropriate to accord such huge weight to [this] factor[ ]"); Alan Ellis, et al., *At a "Loss" for Justice: Federal Sentencing for Economic Offenses*, 25 Crim. Just. 34, 37 (2011) ("While the fraud guideline focuses primarily on aggregate monetary loss and victimization, it fails to measure a host of other factors that may be important, and may be a basis for mitigating punishment, in a particular case. Among these

considerations are: the scope and duration of the offense; the extent to which the offender did or did not personally profit from the offense; the motivation for the offense; the extent to which the offense was exacerbated by factors beyond the offender's control.").

### iii. The base offense level was increased by one level in response to political pressure and against the Commission's better judgment.

In 2003, the base offense level was increased from six to seven for defendants convicted of an offense with a statutory maximum of twenty years. USSG App. C, Amend. 653 (Nov. 1, 2003). The Sarbanes-Oxley Act had raised statutory maximums for most fraud offenses after a "bidding war" in Congress. *See* Frank O. Bowman III, *Pour Encourager Les Autres?*, 1 Ohio State J. Crim. L. 373, 404 (2004). As a result, the one-level increase resulted in a seventeen percent increase in the advisory sentencing range for many fraud offenders, including Mr. Recck.

As its stated reason for the increase, the Commission pointed to Congress' directive in section 905(b)(2) of the Sarbanes-Oxley Act, Pub. L. No. 107-204, which instructed it to consider whether the Guidelines are "sufficient to deter and punish" certain economic crimes "in view of the statutory increases in penalties contained in the Act." USSG App. C, Amend. 653 (Nov. 1, 2003) (Reason for Amendment). Having just substantially raised penalties in 2001, the Commission could have narrowly targeted the high-end corporate scandals that prompted the Sarbanes-Oxley Act. That is what all commentators (other than the Department of Justice) advised, and the empirical evidence showed that across-the board-increases were unnecessary. The Department of Justice, however, placed intense pressure on the Commission to raise sentences for all fraud offenders, privately threatening to go back to Congress for a more specific directive if the Commission did not comply with the Department's wishes. The Commission initially resisted. However, nine months after the Sarbanes-Oxley Act was enacted, one Senator unilaterally inserted into the congressional record a "legislative history" stating that Congress

meant the Commission to raise sentences for both high and low-level fraud offenders, with special attention to the "penalty gap" between fraud and narcotics cases. Bowman, *supra*, at 411-32.

Accordingly, the Commission raised the base offense level from six to seven, stating that the amendment "responds to increased statutory penalties" and that the higher base offense level is "intended to calibrate better the base guideline penalty to the seriousness of the wide variety of offenses referenced to that guideline, as reflected by statutory maximum penalties established by Congress." USSG App. C, Amend. 653 (Nov. 1, 2003). In doing so, the Commission once again ratcheted up the fraud guideline to more closely match the drug guidelines, and explicitly tied the base offense level to the statutory maximum, thus abdicating to Congress its independent judgment regarding the seriousness of the offense. *See* Bowman*, supra*, at 434.

### iv. Widespread disagreement with the fraud guideline is further evidence that it is unsound.

In his concurrence in *United States v. Corsey*, 723 F.3d 366, 377 (2d Cir. 2013), Judge Underhill wrote that "[i]n my view, the loss guideline is fundamentally flawed . . . . [t]he widespread perception that the loss guideline is broken leaves district judges without meaningful guidance in high-loss cases. . . ." Courts are now imposing below-guideline sentences in fraud cases more often than not. In fiscal year 2015, sentences below the guideline range were imposed in 57.6 percent of all fraud cases. *2012 Sourcebook of Federal Sentencing Statistics*, U.S. Sent'g Comm'n, tbl. 27 (2012). Moreover, courts and commentators alike are increasingly expressing their disdain for the fraud guideline: "[I]t is difficult for a sentencing judge to place much stock in a guidelines range that does not provide realistic guidance." *United States v. Parris*, 573 F. Supp. 2d 744, 751 (EDNY 2008); *see also United States v. Watt*, 707 F. Supp. 2d 149 (D. Mass. 2010) (stating that the "Guidelines were of no help"); *Corsey*, 723 F.3d at 379

(Underhill, J., concurring) ("the loss guideline . . . was not developed by the Sentencing Commission using an empirical approach based on data about past sentencing practices" and as a result, "district judges can and should exercise their discretion when deciding whether or not to follow the sentencing advice that guideline provides"); Ellis et al., *supra*, at 6 ("As it stands, the fraud guideline constitutes a series of ad hoc amendments covering a vast array of distinctly dissimilar conduct applying to offenders from the Gordon Gecko variety to the well-intentioned but desperate business owners. There simply is no way the sentences that result from them can be considered principled or even reasonable.").

Given the lack of a rational basis for the fraud guideline, as well as its failure to promote any purpose of sentencing, the Court should not adhere to the advisory sentencing range prescribed by the Guidelines in this case. Instead, in crafting its sentence, the Court should consider the sentencing factors enumerated in U.S.C. § 3553(a), as well as the nature of the offense and Mr. Recck's relevant history and characteristics. Doing so will result in a sentence that is not only more in line with the original intent of the Guidelines, but one that is more likely to do justice in this case.

**C.      A probationary sentence adequately satisfies the goals of sentencing.**

Pursuant to the parsimony clause of 18 U.S.C. § 3553(a), federal sentences must be "sufficient, but not greater than necessary, to comply with the purposes" of sentencing, as set forth in § 3553(a)(2). Accordingly, the Second Circuit has firmly established that when a court believes a more lenient sentence will accomplish the same effects as a harsher one, the court *must* select the more lenient sentence as a matter of law. *United States v. Ministro-Tapia*, 470 F.3d 137, 142 (2d Cir. 2006).

Given the circumstances underlying Mr. Recck's criminal conduct and the events that have occurred since the offense, a probationary sentence is wholly sufficient in serving the purposes of criminal sentencing, which are:

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B) to afford adequate deterrence to criminal conduct;
>
> (C) to protect the public from further crimes of the defendant; and
>
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. §3553(a)(2). In "determining the particular sentence to be imposed," the Court must consider these purposes, the nature and circumstances of the offense and the history and characteristics of the defendant, the kinds of sentences available and the applicable sentence under the Guidelines, pertinent policy statements issued by the Sentencing Commission, the need to avoid unwarranted sentence disparities among similar defendants guilty of similar conduct, and the need to provide restitution to any victims. 18 U.S.C. § 3553(a)(1)–(7).

If Mr. Recck is incarcerated, "[b]oth society and the defendant will pay a dear cost for this sentence and receive very little in return." *United States v. Hughes*, 825 F. Supp. 866, 868 (D. Minn. 1993) (noting the high monetary and societal costs associated with incarcerating an offender). However, if Mr. Recck is given a probationary sentence, he will have an opportunity to make restitution, and to prove to the Court and his community that he is capable of turning his life around. Of course, if Mr. Recck does not rise to the challenge and violates his terms of probation, the Court can revoke the sentence of probation and resentence him to the same sentence he is exposed to today, pursuant to 18 U.S.C. § 3565(a).

## i. Mr. Recck has already received just punishment for his conduct.

In pleading guilty to the charges against him, Mr. Recck recognizes the significant harm that he has inflicted on CCSAR. Indeed, his felony conviction is already exacting a significant penalty. The collateral consequences of such a conviction are "harsh" and "long-lasting,"[47] and should not be underestimated by the Court in its sentencing decision. *United States v. Stewart*, 590 F. 3d 93, 141 (2d Cir. 2009) ("[I]t is difficult to see how a court can properly calibrate a 'just punishment' if it does not consider the collateral effects of a particular sentence."). Mr. Recck has been subject to a federal criminal investigation, charged with a felony, and has pled guilty. He has remained on pre-trial supervision for nearly two years and has been subject to a rigorous set of conditions, which were more intensive than usual due to his participation in the support court program. Additionally, even under a probationary sentence, Mr. Recck will continue to face significant reputational, financial, emotional and personal ramifications for his offense.

Due to his conviction, Mr. Recck has been forced to forfeit his professional licenses and give up a well-paying job. Despite his long, prosperous career as a financial adviser and his strong relationships with former clients, he is no longer employable in the financial or insurance industries. In fact, his employment opportunities are now significantly limited: beyond the legal restrictions on licensure, employment discrimination against people with felony records in the private sector is widespread.[48] Mr. Recck has given up his home and car, and uprooted his comfortable life in Connecticut in search of gainful employment. The gambling addiction also

---

[47] *Statement by the President on Executive Clemency for Lewis Libby*, White House Office of the Press Sec'y (July 2, 2007), http://georgewbush-whitehouse.archives.gov/news/releases/2007/ 07/20070702-3.html/.

[48] Harry J. Holzer, et al., *Employment Barriers Facing Ex-Offenders*, Urban Institute Reentry Roundtable 8-10 (May 2003), http://www.urban.org/sites/default/files/ alfresco/publication-pdfs/410855-Employment-Barriers-Facing-Ex-Offenders.PDF.

accelerated the deterioration of his marriage and alienated many acquaintances and members of his community. These collateral consequences constitute just punishment and should be reflected in Mr. Recck's sentencing. *See, e.g., Stewart*, 590 F. 3d 93 (approving a variance from the Guidelines because defendant's loss of career prospects was just punishment); *United States v. Gaind*, 829 F. Supp. 669, 671 (S.D.N.Y. 1993) (allowing a significant downward departure because defendant was punished by the loss of his business); *United States v. Anderson*, 533 F.3d 623, 633 (8th Cir. 2008) (recognizing professional and reputational loss as an "atypical punishment" because it exceeds standard forms of punishment).

Additionally, a retributive theory of justice generally assumes that offenders deserve punishment as a form of compensation for the victim's suffering. However, the persons who comprise the victim in this case—the members of CCSAR—do not desire a sentence of imprisonment for Mr. Recck. To the contrary, Mr. Recck's former colleagues at CCSAR have been very supportive of his rehabilitation efforts and are satisfied by his atonement and transformation. In her letter of support, CCSAR founder Alice Kugelman states: "If Tom has overcome his gambling addiction, I have no doubt that he can be a fully functioning member of society. I hope the court will understand that he is basically a good person with many redeeming qualities, and will show him mercy."[49]

### ii. A probationary sentence will provide adequate specific and general deterrence.

There is no need for the Court to deter Mr. Recck from future criminal behavior through incarceration, since his risk of recidivism is already extremely low. The root cause of Mr. Recck's criminal activity was his gambling disorder, which he is now addressing through

---

[49] Exhibit O, Letter from Alice Kugelman to the Court.

psychotherapy and Gamblers Anonymous. He has maintained his abstinence for over two years, and he is now eager to close this dark chapter and continue rebuilding his life.

Additionally, according to the Sentencing Commission, key demographic factors determining general recidivism risk for federal offenders include: criminal history, employment history, nature of offense, age, and level of education. Along each of these axes, Mr. Recck presents an extremely low risk of reoffending: he is an employed, divorced fifty-one-year-old individual with a college degree, and no prior criminal record.[50] For Category I offenders who are over the age of fifty at the time of sentencing, the recidivism rate is only 6.2 percent (compared to 29.5 percent for those under age twenty one); for those who are college graduates, the rate is only 7.1 percent (compared to 21.3 percent for those who did not complete high school); for those who are divorced, the rate is only 9.8 percent (compared to 22.7 percent for those who were never married); and finally, for those who have been employed, the rate is only 12.7 percent (compared to 20.6 percent for those who were unemployed).[51] Moreover, only about 17.4 percent of *all* federal offenders with zero total criminal history points are reconvicted for new crimes, compared to 28.8 percent of offenders with just one criminal history point.[52] The Sentencing Guidelines do not account for this "demonstrable difference in the recidivism rates of *real* first offenders as compared to other defendants in Criminal History Category I," but the necessity for deterrence is clearly reduced for offenses such as the present one, which

---

[50] *See Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines*, U.S. Sent'g Comm'n (May 2004), http://www.ussc.gov/sites/default/files/pdf/ research-and-publications/research-publications/2004/200405_Recidivism_Criminal_History. pdf.
[51] *Id.* at 28-29.
[52] *Recidivism Among Federal Offenders: A Comprehensive Overview*, U.S. Sent'g Comm'n at 18 (Mar. 2016), http://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2016/recidivism_overview.pdf.

"represent a marked deviation . . . from an otherwise law-abiding life." *United States v. Germosen*, 473 F. Supp. 2d 221, 227-8 (D. Mass. 2007) (emphasis added). *See also United States v. Ward*, 814 F. Supp. 23, 24 (E.D. Va. 1993) (allowing a downward departure for a forty-nine-year-old first-time offender because the Guidelines do not take into account the length of a defendant's crime-free life prior to the offense).

Finally, empirical research suggests that, especially among white-collar offenders, the form and severity of an offender's sentence does not significantly impact the level of general or specific deterrence the sentence provides. *See, e.g.*, Zvi D. Gabbay, *Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and White Collar Crime*, 8 Cardozo J. Conflict Resol. 421, 448-49 (2007) ("[T]here is no decisive evidence to support the conclusion that harsh sentences actually have a general and specific deterrent effect on potential white-collar offenders."); David Weisburd et al., *Specific Deterrence in a Sample of Offenders Convicted of White Collar Crime*s, 33 Criminology 587, 587 (1995) (finding that "prison does not have a specific deterrent impact upon the likelihood of rearrest over a 126-month follow-up period"). Therefore, a probationary sentence, in addition to all of the collateral consequences previously discussed, is sufficient to satisfy this purpose.

### iii. Mr. Recck poses no threat to the public welfare.

As outlined above, Mr. Recck presents an extremely low risk of repeating his offense, both due to his demographic background and his strong commitment to rebuilding a productive, law-abiding life. He is completely abstinent from gambling and drinking alcohol, and he has surrounded himself with a strong support system that will keep him on the right path. It has been approximately six years since he committed the offense and he has engaged in no new criminal conduct. Mr. Recck has been employed in two different positions since his offense conduct and

has demonstrated that he is able to refrain from re-offending. He has also reaffirmed his dedication to public service by getting involved with various charity organizations in his new community in Cincinnati, Ohio. *See* Exhibit Q, Letter from Allen Nice to the Court ("I can assure you Thomas has changed and learned from his mistake. It shows everyday. He still volunteers to this day, gives countless hours to his community and is working non-stop for AmRide."); Exhibit Z, Letter from Shaun Hyatt to the Court ("Tom has been committed to becoming a productive member of the Cincinnati community by joining the Cincinnati Chamber and volunteering at many charitable events here in Ohio and Kentucky."). Imprisoning Mr. Recck would only increase the threat that he poses to himself and the public by disconnecting him from the stabilizing influences in his life and potentially exposing him to unnecessary trauma as a result.

iv.  **Mr. Recck is currently receiving effective correctional treatment and medical care.**

Mr. Recck has been very proactive and responsible in seeking out correctional treatment for his gambling addiction and medical care for the underlying psychological issues. He has been regularly attending Gamblers Anonymous meetings since 2012, and when he moved from Connecticut to Ohio, he immediately sought out a local branch to continue his treatment. Similarly, he has been receiving counseling from Patricia Devendorf at the Wheeler Clinic and maintains regular contact with her despite the geographical distance.

Under § 3553(a)(2), the Court is asked to consider the *most* effective manner of giving a defendant rehabilitative treatment. In this instance, there is no reason to believe that the services offered in prison will be nearly as effective in meeting Mr. Recck's specific needs as his current treatment. According to the Federal Bureau of Prisons directory of national programs, there are currently no available prison services that are targeted directly at rehabilitating problem

gamblers.[53]  Furthermore, it is very likely that Mr. Recck will involuntarily be exposed to problematic gambling triggers if he is incarcerated; multiple studies conducted in the United States, as well as Australia and New Zealand, have shown that between twenty-one to thirty-eight percent of prison inmates display symptoms of an ongoing gambling addiction and practice gambling behaviors regularly.  *See, e.g.*, D.I. Templer, et al., *Correlates of Pathological Gambling Propensity in Prison Inmates*, 35 Comprehensive Psychiatry 347 (1993); Dennis B. Anderson, *Problem Gambling Among Incarcerated Male Felons*, 3-4 J.  Offender Rehabilitation 113 (1999); Max W. Abbott, et al., *Gambling and Problem Gambling among Recently Sentenced Male Prisoners in Four New Zealand Prisons*, 21 J. Gambling Studies 537 (2005); J. Lahn, *Gambling Among Offenders:  Results from an Australian Survey*, 49 Int'l J. Offender Therapy Comp. Criminology 343 (2005).  Placing Mr. Recck in such an environment would be counterproductive to his efforts at rehabilitation and could potentially undermine his recovery.

**D.     A sentence of imprisonment would not only be greater than necessary, but would run counter to the goals of sentencing.**

A sentence of imprisonment, let alone one within the guideline range, will not only be greater than necessary, but will in fact run counter to the goals of sentencing.  By causing Mr. Recck to lose his job, imprisoning him will increase rather than decrease the likelihood that he will commit future crimes.  Furthermore, incarcerating Mr. Recck will severely hinder his efforts at rehabilitation, both by depriving him of much needed treatment and exposing him to a variety of circumstances likely to trigger a relapse.

---

[53] *A Directory of Bureau of Prisons' National Programs*, Fed. Bureau of Prisons (May 22, 2015), https://www.bop.gov/inmates/custody_and_care/docs/BOPNationalProgramCatalog.pdf.

### i.    Imprisoning Mr. Recck will increase his likelihood of committing future crimes.

As previously discussed, Mr. Recck is highly unlikely to recidivate if sentenced to probation. This is due in large part to his employment status. *See* Jessica S. Henry & James B. Jacobs, *Ban the Box to Promote Ex-Offender Employment*, 6 Criminology & Pub. Pol'y 755, 755 (2007) ("It is close to a criminological truism that the lack of a legitimate job fosters criminality and, conversely, that holding a legitimate job diminishes criminal conduct."); Mark W. Lipsey, *What Do We Learn from 400 Research Studies on the Effectiveness of Treatment with Juvenile Delinquents?*, in WHAT WORKS: REDUCING REOFFENDING 63–78 (James McGuire ed., 1995) (conducting a meta-analysis of nearly 400 studies from 1950 to 1990 found employment to be the single most effective factor in reducing recidivism). Moreover, the positive evaluations that Mr. Recck has received from his employer,[54] coupled with his recent promotion, suggests his employment is more secure than that which is typically held by someone with a felony conviction. *See* Christy A. Visher et al., *Employment After Prison: A Longitudinal Study of Former Prisoners*, 28 Just. Q. 698, 702 (2011) (finding that eight months after their release, 65 percent of recently-released ex-prisoners had found work since their release, but only 45 percent were still employed). In short, one would be hard pressed to find an offender who is better situated to lead a productive, law-abiding life going forward.

However, if Mr. Recck is sentenced to a term of imprisonment, his outlook will be very different. His employer is aware of his upcoming sentencing, and has informed Mr. Recck that it will need to find someone to fill his current position if he is incarcerated. Furthermore, if Mr. Recck is incarcerated, his employer has made no promise to rehire him upon his release. This means that he would need to search for new employment after his imprisonment ends. The

---

[54] Exhibit H, Letter from Rene Rodriguez to the Court.

prospect of his obtaining steady employment, even with his work history and education, is slim. In addition to his status as a felon, his age, his debarment from working in the financial and insurance industries, and the nature of his crime all significantly lessen his likelihood of finding new employment. *See* Binyamin Applebaum, *Out of Trouble, but Criminal Records Keep Men Out of Work*, N.Y. Times (Feb. 28, 2015), http://www.nytimes.com/2015/03/01/business/out-of-trouble-but-criminal-records-keep-men-out-of-work.html (noting that "[t]he reluctance of employers to hire people with criminal records, combined with laws that place broad categories of jobs off-limits" is preventing felons from becoming "productive members of society"); Connie R. Wanberg, *Age and Reemployment Success After Job Loss: An Integrative Model and Meta-Analysis*, 142 PSYCHOL. BULL. 400 (2016) (finding that older adults receive fewer job offers, search for work weeks longer, and are less likely to find reemployment after losing a job, and that "as an individual moves beyond age 50, they experience a large penalty toward how quickly they will find a job").

As a result, sentencing Mr. Recck to a term of imprisonment, by depriving him of his job, the most stabilizing influence in his life, will increase his otherwise slim likelihood of reoffending. The difficulties of obtaining employment after serving time in prison are well documented, *see, e.g.*, Christy Visher, et al., *Employment after Prison: A Longitudinal Study of Releasees in Three States*, Urban Institute Justice Policy Center, 1 (2008) (finding that "[m]ost individuals released from prison held some type of job prior to incarceration and want legal, stable employment upon release . . . . However, most former prisoners experience difficulty finding a job after release"), as are the increased chances of an unemployed felon committing further crimes. *See* Art Lurigio, *Presentation of Safer Foundation Recidivism Study at the 135th Congress of Correction*, American Correctional Assoc. (Aug. 8, 2005) (stating that of 1,600

individuals released from state prison, only 8 percent of those who were employed for a year committed another crime, compared to the state's 54 percent average recidivism rate). Incarcerating Mr. Recck will therefore increase the likelihood that he reoffends, directly undermining the purpose of sentencing set forth in § 3553(a)(2)(C).

### ii. Imprisoning Mr. Recck will severely hamper his efforts at rehabilitation.

While Mr. Recck has made great strides toward rehabilitating himself, he is by no means "cured." Like most recovering addicts, he must work hard to maintain his sobriety and to abstain from gambling, especially when he is stressed or when others around him are participating in these activities. Despite the occasional presence of these triggers, Mr. Recck has managed to avoid drinking alcohol for over nine months and has not gambled since early 2014. He attributes his ability to stay clean to his therapy sessions, his Gamblers Anonymous meetings, and the support of the friends he has met both through his treatment and through his work.[55] He recognizes the critical role these experiences play in his quest to stay sober, remain productive, and continue to make restitution.

If Mr. Recck is incarcerated, during that time he will not be able to see his therapist, attend Gamblers Anonymous meetings, contact his sponsor, or continue to build and maintain his sober support network. While many federal prisons offer some treatment and support to inmates, the limited resources at many facilities, as well as the overwhelming need for such services, often means inmates who desperately need treatment do not receive it. *See* KiDeuk Kim et al., *The Processing and Treatment of Mentally Ill Persons in the Criminal Justice System: A Scan of Practice and Background Analysis*, 10 (March 2015), http://www.urban.org/sites/default/files/ alfresco/publication-pdfs/2000173-The-Processing-and-Treatment-of-Mentally-Ill-Persons-in-

---

[55] *See* Exhibit K, Letter from Thomas Recck to the Court.

the-Criminal-Justice-System.pdf (noting that 45 percent of federal inmates suffer from mental health problems but only one-third reported having received mental health treatment since incarceration). Ironically, the many stressors of prison have a tendency to exacerbate any preexisting mental health issues, rendering the need for such treatment more acute. This is particularly worrisome for someone like Mr. Recck, who has a documented history of suicidal ideation. *See* Exhibit I. *See Mentally Ill Offenders in the Criminal Justice System: An Analysis and Prescription*, The Sentencing Project 18 (2002), http://www. sentencingproject.org/wp-content/uploads/ 2016/01/Mentally-Ill-Offenders-in-the-Criminal-Justice-System.pdf (finding that "[s]uicide rates among mentally ill inmates who have made previous attempts are more than 100 times higher than the rate in the general population). Indeed, the distinct likelihood that Mr. Recck would be unable to obtain the treatment and support he needs during incarceration would render him highly susceptible to relapse or a mental breakdown.

Further increasing the likelihood that a sentence of imprisonment will impede Mr. Recck's rehabilitative progress is the fact that gambling is such a common aspect of prison life. *See*, *e.g.*, *Literature Review for Gambling Among the Corrections Population*, Or. Dep't of Human Servs. 1 (2007) ("Once in prison, gamblers typically do not improve. Gambling is common in the prison culture, and is accepted as a way to alleviate boredom"); Robert William et al., *Gambling and Problem Gambling Within Forensic Populations*, 32 Crim. Just. Behavior 665, 669 (2005) (finding that "the prevalence of gambling within correctional facilities is 40%" and that "inmates who do gamble tend to do so regularly, and problem and pathological gamblers are disproportionately represented among this group"); Robert Rosso, *Gambling in Federal Prison*, The Fix (Dec. 16, 2015), https://www.thefix.com/ gambling-federal-prison.html (describing how staff at a medium security prison in North Carolina "facilitated an environment

that allowed inmates to run poker tables, gambling pools, sports betting operations and otherwise gamble without fear of disciplinary action or criminal prosecution" and that "[i]n many Bureau of Prison facilities across the nation this is the norm"). This widespread opportunity to gamble would make prison a likely trigger for Mr. Recck that might cause him to veer off his road to recovery.

Given the paucity of treatment options in prison, the general stress of incarceration, and the widespread availability of gambling, a sentence of imprisonment threatens to not only hinder Mr. Recck's rehabilitation, but to completely undo all the progress he has made over the last four years. This, in turn, will render him less likely to find and maintain employment, avoid reoffending, and continue paying restitution. It is therefore clear that imposing a sentence of imprisonment on Mr. Recck would fail to provide him with corrective treatment in the "most effective manner," and thus would not comply with the statutory directives of § 3553(a)(2)(D).

**E.      A probationary sentence will better enable Mr. Recck to continue to provide restitution to the victim.**

In determining the appropriate sentence, this Court must consider "the need to provide restitution to any victims of the offense." *See* 18 U.S.C. § 3553(a)(7); *see also, e.g.*, *United States v. Menyweather*, 447 F.3d 625, 634 (9th Cir. 2006) (acknowledging district court's discretion to depart from guidelines to impose probationary sentence, since the "goal of obtaining restitution for the victims of Defendant's offense . . . is better served by a non-incarcerated and employed defendant"); *United States v. Coleman*, 370 F. Supp. 2d 661 (S.D. Ohio 2005) (sentencing defendant with guideline sentence calculation of 6-12 months to probation, community treatment center and house arrest in part because "five years probation, as opposed to one year of imprisonment or imprisonment with supervised release, will afford Defendant more time to pay restitution"); *United States v. Peterson*, 363 F. Supp. 2d 1060 (E.D.

Wisc. 2005) (sentencing defendant, a gambling addict in counseling, to one day in prison and five years of supervised release in part so defendant would not lose his job and could pay restitution).

Mr. Recck has been providing restitution to the victim on a regular basis, and is determined to continue to do so until the victim is made whole.[56] As mentioned previously, Mr. Recck is currently employed as a regional manager at AmRide, a position he was promoted to after working for a year as a driver. Furthermore, Mr. Recck's immediate supervisor and the CEO have repeatedly expressed their satisfaction with his performance.[57] The company is growing rapidly, and Mr. Recck is confident that he has the potential to continue to gain additional responsibility and, in turn, earn an even higher salary. This will enable him to make higher restitution payments and to make his victim whole even sooner.

However, if Mr. Recck is incarcerated, his restitution payments to the victim will cease. He has no savings, and will not be able to earn money while in prison. If Mr. Recck were sentenced within the guideline range, he would not be released until, at the very least, twenty-one months after sentencing, and no restitution would be provided during that time. Incarcerating Mr. Recck will also likely decrease his ability to pay restitution in the long run, since there is no guarantee he will be rehired to his current position upon release, and it will be extremely difficult for Mr. Recck to obtain new employment now that he has a felony conviction.[58]

This Court should seek to maximize, rather than impair, Mr. Recck's ability to make the restitution the victim deserves, and this can best be accomplished with a sentence of probation.

---

[56] *See* Exhibit B, Chart documenting restitution payments.
[57] *See* Exhibit H, Letter from Rene Rodriguez to the Court; Exhibit P, Letter from Kevin Wynne to the Court.
[58] *See*, Visher, et al., *supra*.

## III. CONCLUSION

For over forty years of his life, Thomas Recck was an honest, hardworking man with a stable career and no criminal history. In the late 2000s, a series of tragic circumstances caused him to develop a serious gambling addiction, which eventually led to Mr. Recck making a grave mistake. Since the offense, he has shown deep remorse and made great strides in rehabilitating himself. He is currently abstinent from gambling and alcohol; he is succeeding in a new career path; and he is continuing to pay restitution to CCSAR. Incarceration would destabilize Mr. Recck's life by causing him to lose his job and removing him from his treatment and support network, thereby increasing his risk of recidivism and not allowing him to pay CCSAR back for the funds he stole.

For all of the foregoing reasons, Mr. Recck respectfully submits that a sentence of five years of probation, plus three hundred hours of community service, mental health treatment, and payment of restitution, is sufficient, but not greater than necessary, to accomplish the purposes of sentencing.

Respectfully Submitted,

THE DEFENDANT,
THOMAS RECCK

FEDERAL DEFENDER OFFICE


Date: October 17, 2016      /s/ Kelly Barrett
      Assistant Federal Defender
      265 Church Street, 7th FL
      New Haven, CT 06510
      Phone: (860) 498-4200
      Bar No.: ct27410
      Email: kelly_barrett@fd.org


*Assisting on the Brief*:  Noah Kolbi-Molinas and Loren Oumarova
      Student Interns
      Yale Law School Clinic


<u>CERTIFICATE OF SERVICE</u>

      I HEREBY CERTIFY that on October 17, 2016, a copy of the foregoing THOMAS RECCK'S MEMORANDUM IN AID OF SENTENCING was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

      /s/ Kelly Barrett
      Kelly Barrett